OPINION OF THE COURT
Herman Cahn, J.
The People move for an in limine ruling by the court permitting the introduction of certain evidence in the form of voice identification by spectrographic analysis. Defendant Patrick Carrabis (Carrabis) whose voice is the subject of this spectrographic analysis, objects to the introduction of such evidence on the ground that said procedure has not reached the standard of scientific acceptance and reliability to warrant its admission into evidence.
Carrabis, together with 30 other defendants, has been charged with scheme to defraud in the first degree, section 190.65 of the Penal Law, conspiracy to commit scheme to defraud, section 105.05 of the Penal Law, and violations of sections 352-c and 352-e of the General Business Law. During the course of the investigation of these charges, conversations were tape recorded by a confidential informant, working in conjunction with the Federal Bureau of Investigation. With the sole exception of Carrabis’ voice, the other voices on the tape can evidently be identified by a testifying witness.
*1022 As the issue of the identity of one of the voices on the tape recording was contested, the People requested and obtained a voice exemplar from Carrabis. The various recordings (the tape sought to be identified and the exemplar) were then subjected to spectrographic analysis. The People intend to offer the result of such analysis for the jury’s consideration.
A hearing was held on the subject on July 2, 1982, at which time both the People and defendant called qualified experts on the subject of the use and accuracy of spectrographic analysis (voiceprints). The People called Sergeant Smrkovski, the officer in charge of the voice identification unit, for the Michigan Department of State Police. Dr; Louis J. Gerstman, Professor of Psychology and Speech and Hearing Science at the City University of New York was called by the defendant.
The sound of a human voice is produced by air being forced through the vocal chords. Frequency, or the time interval between vocal chord vibrations, is an important voice characteristic. The intensity of these vibrations, or the loudness of the sound produced, together with the frequency, are major aspects of the voice.
Speech is produced in an individual by manipulations of the articulators (lips, tongue, teeth, palate, jaw muscles) and by the natural formation of the person’s throat, nasal and oral cavities. The vibrations coming from the vocal chords pass through these cavities and are manipulated and refined by the articulators. It is claimed that the conjunction of these numerous variables in any one individual, causes each individual’s voice to be unique, i.e., no two voices are exactly alike. Voice analysis rests on the unlikeliness that any two individuals could have the same voice pattern, vocal cavities or articulators.
The court in People v Collins (94 Misc 2d 704, 705), described the spectrograph as follows:
“Briefly, a sound spectrograph is a device which converts sound waves into electrical signals. These signals are transduced into mechanical energy which operates a stylus. The stylus ‘burns’ a visual pattern onto a paper. This pattern is known as a sound spectrogram.
*1023 “This spectrogram is commonly called a ‘voiceprint’.
“The visual pattern displayed on the spectrogram is an analogue of the frequency, intensity, and duration of the sound waves introduced into the spectrograph.”
Spectrographic voice analysis consists of using these visual arrays to compare two exemplars of voices to see whether or not the same person spoke on each exemplar.
The People’s witness, Lonnie Smrkovski, testified concerning spectrographic voice analysis and the examiners who perform these comparisons. He testified as to the details of the training undergone by the examiners before they are certified. The examiner must first take a one-month course in speech pathology and audiology. He will then enter a two-year training period consisting of laboratory tasks and forensic experience. The trainee is given recordings for analysis and performs spectrographic analysis and comparisons daily. An oral and written examination testing the ability to compare and the accuracy of the comparisons is administered. Upon satisfactorily completing this course of training, he is certified as voice spectrogram examiner by the International Association of Voice Identification. This training program ensures the competence and expertise of each examiner. The witness himself is so certified, and is assigned to the Voice Identification Unit of the Forensic Science Laboratory of the Michigan Department of State Police.
In judging the accuracy of voice analysis, one is concerned with two separate results, i.e., identifications and eliminations. Identifications refer to the instances when the voice on the exemplar is identified as being the same voice as that of a person whose voice is on the tape compared; eliminations refer to the instances when the voices are identified as not being the same voices. Since in the instant case, the voice examiner determined that the voices on the exemplar and the tape were identical, we are here concerned only with identification and the accuracy thereof.
The witness described the various studies performed commencing with those performed by Dr. Oscar Tossi, and including studies performed over the past several years in *1024 the United States and abroad. He testified that in those instances where the examiners were permitted to judge identification or the lack thereof, by both listening to the two exemplars (and testing) and analyzing them spectrographically, and where no time limit for decision was imposed, the rate of false identifications was zero. This does not mean that every voice was correctly identified; it means that wherever an examiner arrived at an identification, the identification was found to be correct.
Subsequent studies were conducted using only examiners certified by the International Association of Voice Identification. These examiners were allowed to listen to the recordings as well as view the spectrograms, were given all the time they required and were not compelled to decide in any case. In every case in which there was a decision, it was the correct one.
The voice recordings used were taken from many different real-life contexts, such as over the telephone, with background noise, unclear recordings, and in isolation. Other studies have shown that a mimic cannot change his own voice spectrogram, and that voice spectrograms can identify the same speaker after a long period of time.
These studies led the Association of Official Analytical Chemists to adopt this method of aural and spectrographic comparison as reliable for identification or elimination of suspects’ voices.
The standards that have emerged for reliable voice comparisons are that a minimum of 10 words should be used, should be compared both aurally and by voice spectrogram and that the examiner should not decide or be compelled to decide unless he is certain of his findings. When these standards are adhered to, any identifications found by a certified voice spectrogram examiner are entitled to be considered by a finder of fact.
The court has also carefully considered the testimony of Dr. Louis J. Gerstman, whose testimony was offered by Carrabis. He testified that voice identification by spectrographic means is at best inaccurate. The court feels that his experience is not in the field about which he sought to testify, and was not convinced by his testimony.
*1025 A determination as to whether such evidence is admissible turns upon a consideration of two criteria, which criteria have been incorporated by various courts as one test and by others as distinct and separate tests (People v Collins, 94 Misc 2d 704, 707, supra): (1) whether the procedure has been generally accepted by the relevant scientific community and/or (2) whether there is competent expert testimony establishing the reliability of the voice-print process. (See Admissibility and Weight of Voiceprint Evidence, Ann., 97 ALR3d 294.) Difficulty in applying the first consideration, generally known as the “Frye test” {Frye v United States, 293 F 1013), “has led a number of courts to its implicit modification” (United States v Williams, 583 F2d 1194, 1198).
Although the weight of authority on the trial and appellate levels, in the Federal and State courts (other than in New York) has come generally to support the admissibility of spectrographic voice identification evidence (United States v Williams, supra, at p 1197; People v Rogers, 86 Misc 2d 868, 881), only two reported New York cases have heretofore expounded the subject, and have come to conflicting conclusions. In People v Rogers (supra), the earlier of the two reported cases, the court upheld the admissibility of the procedure, acknowledging that although voice-prints were not as infallible as fingerprints, their reliability was as great or greater than other scientific tests, including blood alcohol and the analysis of hairs and fibers. These latter scientific tests have commonly been held to be admissible in trial proceedings. The Rogers court (supra, at p 881) concluded that “voice identification by means of visual spectrogram analysis, when accompanied by aural examinations and comparisons and when conducted by a properly qualified examiner, has now reached the level of general acceptance by those who would be expected to be familiar with its use. Voice spectrogram analysis has reached the standards of scientific acceptance and reliability necessary for its admissibility into evidence with ultimate consideration by the trier of facts.”
In People v Collins (supra), the court concluded that the twofold test of reliability and general scientific acceptance must be applied to determine the admissibility of spectro *1026 graphic analysis for voice identification. Applying these tests, after an extensive hearing, that court determined that the evidence failed to establish that this procedure had gained general acceptance in the relevant scientific community, and furthermore, that the reliability of the voiceprint process had not been established. The court in Collins (supra), relied heavily on the standards of admissibility set forth in People v Leone (25 NY2d 511), which decided against the admissibility of polygraph tests. In People v Leone (supra, at p 518), the court stated: “[w]e are all aware of the tremendous weight which such tests would necessarily have in the minds of a jury. Thus, we should be most careful in admitting into evidence the results of such tests unless their reasonable accuracy and general scientific acceptance are clearly recognized.”
After carefully reviewing the testimony of the experts herein and weighing the relevant authorities on the subject, this court finds that voice identification by spectrographic analysis has been shown to be a sufficiently reliable procedure, such that the results of a voiceprint test may be submitted to the jury for consideration. Furthermore, the testimony of Sergeant Smrkovski convinces the court that the procedure has been generally accepted in the relevant scientific community. For this purpose, the court has considered the relevant scientific community to be that group of scientists who are concerned with the problems of voice identification for forensic and other purposes. The court also notes that the courts of many other jurisdictions applying the same tests have come to the same results (United States v Williams, supra), which in and of itself is strong proof of the fact that the procedure’s reliability is accepted in the relevant scientific community. Although the court notes the expertise and training of both prosecution and defense experts, Sergeant Smrkovski convinced the court of the procedure’s reliability when performed by a certified voice examiner. The record amply demonstrates that safeguards were employed to assure the test’s reliability.
More important in the court’s determination is the fact that it will be for the jury to determine the weight and credibility to be given to such testimony, as in the case of *1027 any expert testimony. It is no different in this field of expertise than in other fields, that where experts disagree, it is for the finder of fact to determine which testimony is more credible and therefore more acceptable. As the court in United States v Williams (supra, at pp 1199-1200) pointed out: “The objective components supplied by spectrography are subject to direct evaluation by the jury. The tapes can be played, and, if need be, replayed for the jury. The spectrograms themselves can be examined and compared by the jury. In addition, the normal safeguards are fully available. The expert’s qualifications, the reliability of his equipment, the reliability of the technique itself, and in essence the accuracy and reliability of the spectrograms, are all subject to challenge and attack through cross-examination and the testimony of opposing experts. Finally, the jury can be instructed that the expert’s opinion is solely for their assistance, and subject to their complete rejection if they consider it unreliable.”
The court having found spectrographic analysis evidence admissible, the People may introduce such evidence.
The motion is granted.